JOURNAL ENTRY and OPINION
{¶ 1} Ohio considers a lease of tangible personal property to be exempted from state excise tax. The partners of AM JB Corporation ("the partnership") bought an aircraft and sought to characterize an arrangement it had with Corporate Wings, Inc. ("CWI") as a lease of the aircraft for tax purposes. The Board of Tax Appeals (the "board") affirmed the tax commissioner's determination rejecting the characterization of the agreement as a "lease," leaving the partnership with a tax assessment of $611,128.
 {¶ 2} Ohio subjects the storage, use or consumption of tangible personal property to an excise (use) tax. See R.C. 5741.02(A). This tax does not apply, however, to tangible personal property or services that would be subject to the state sales tax. See R.C. 5741.02(C)(2). In general, a sales tax is levied on each retail sale. However, if the item to which the sales tax applies is intended for resale, no tax is applied. See R.C. 5739.01(E)(1). The definition of resale includes tangible personal property that is purchased with intention of granting a license (or lease) for its use. See R.C. 5739.01(B)(1).
 {¶ 3} There is a presumption that "every sale or use of tangible personal property in this state is taxable." Moulton Gas Serv. v.Zaino, 97 Ohio St.3d 48, 2002-Ohio-5309, at ¶ 12. For this reason, statutes relating to exemption or exception from taxation are to be strictly construed and the taxpayer bears the burden of proving its entitlement to a tax exemption. Id.; Barry Equipment Co. v. Limbach
(1988), 40 Ohio St.3d 119, 120.
 {¶ 4} Because the purchase price of corporate jets is so high, they are often purchased under a "leaseback" arrangement. The seller is typically known as a "fixed base operator" ("FBO") and is involved in the charter, air taxi or flight school business. The methodology behind an aircraft leaseback was summarized in Gordon, Flying into the Blue Sky: Aircraft Leasebacks as Securities (1988), 35 UCLA L.Rev. 779, 781-782:
 {¶ 5} "Under the leaseback, the buyer purchases the aircraft and leases it back to the FBO. The FBO rents the aircraft to student pilots and other customers and pays the buyer a portion of the rental income. For example, the FBO might charge rental customers $ 65.00 per hour and pay the buyer $ 50.00 for each hour that the aircraft is rented. The FBO provides all maintenance for the aircraft at the FBO's discretion and at the buyer's expense.
 {¶ 6} "The salesperson shows the buyer the aircraft's income-producing potential based on an assumed number of rental hours, and shows the buyer a chart calculating the tax benefits and costs of ownership. These tax benefits include deductions for accelerated depreciation, interest, personal property taxes, insurance, hangar or tie-down space, and maintenance. Sometimes the salesperson represents or the documents show that the projected rental income and tax benefits will equal or even exceed the monthly payments and other costs of the aircraft and leaseback. It appears to be an ideal tax shelter; the aircraft pays for itself, and the buyer may even receive some income on top. The buyer intended to fly the aircraft only a few hours per week or month anyway, and the leaseback turns the aircraft's otherwise idle time into income.
 {¶ 7} "The FBO has several motivations to structure the deal as a leaseback. First, the leaseback is a sales tool to entice a prospective purchaser into buying an expensive aircraft he might not otherwise buy. Dealer markups range up to 25 percent of the final sales price. While a buyer simply purchasing an aircraft can expect substantial negotiability in the price, sales coupled with leasebacks typically are made only at the full list price. The buyer generally is not as concerned about price because the aircraft is supposed to pay for itself. Second, the FBO receives additional income because it services the aircraft at its discretion but at the buyer's expense, and rents hangar or tie-down space to the buyer. Third, leasebacks capitalize expensive aircraft necessary to the FBO's rental business at no cost to the FBO except a portion of the rental income. The FBO avoids the considerable expenses of purchasing, insuring, and servicing the aircraft, as well as the cost of modifications required by airworthiness directives issued by the Federal Aviation Administration (FAA). Fourth, the typical leaseback has liberal cancellation provisions. As a result of aircraft leasebacks, FBO can modernize their fleets frequently and offer the latest aircraft in their rental, charter, and flight instruction businesses. FBO typically are highly competitive, and an FBO with the latest equipment has a competitive advantage." (Footnotes omitted.)
 {¶ 8} The tax ramifications of leasebacks in Ohio have been discussed in two cases. In Fliteways v. Lindley (1981), 65 Ohio St.3d 21, Fliteways purchased several aircraft for use in a charter operation, using them to transport passengers and freight in exchange for an hourly fee. Trying to avoid the excise tax on grounds that a resale had occurred, Fliteways argued that its hourly rate for the service constituted a "lease" of the aircraft under R.C. 5739.01(B)(1). The Supreme Court rejected this argument because it found that Fliteways "furnished and maintained the airplanes, employed the pilots and thus merely utilized its airplanes in transporting passengers and freight." Id. at 24.
 {¶ 9} In Laurel Transp. v. Zaino (2001), 92 Ohio St.3d 220, the Ohio Supreme Court considered a nearly identical factual situation involving CWI's participation in a similar relationship with a company known as Laurel Transportation. Laurel bought a jet aircraft and entered into a management agreement with CWI. CWI operated the aircraft and provided management and services, along with pilots. If Laurel wanted to use the aircraft it had to pay a rental fee, although at a discounted rate to that charged other users. Rejecting an argument that Fliteways could be distinguished, the Supreme Court concluded that:
 {¶ 10} "We find essentially no difference between this case and Fliteways. Here, and in Fliteways, the owners furnished an aircraft, fuel, and pilot to users for an hourly fee, albeit through contractual agreements with others. Laurel distinguishes Fliteways from this case because Laurel contracted with Wings to maintain the aircraft and to furnish fuel and pilots. We do not agree that this is a defining difference. Laurel chose the third party to furnish the pilots. While the users could determine when and where they wanted to travel, Laurel provided the transportation service that took them. Laurel controlled the aircraft by contracting with Wings to fly the aircraft." Id. at 222.
 {¶ 11} These two cases stand for the proposition that unless AM JB can demonstrate that it truly leased the aircraft to CWI, the transaction would not be considered a "resale" under the applicable exemption, and thus subject to the excise tax.
 {¶ 12} The tax commissioner and the board both concluded that no true lease of the aircraft existed because there had not been a sufficient transfer of possession and control of the aircraft. In reaching this conclusion, they relied on the existence of a management agreement authorizing CWI to exercise operational control over the aircraft. Had a true lease existed, AM JB would have no need to exert such control. The board held as follows:
 {¶ 13} "Based upon the forgoing [sic.], we find that there was sufficient evidence upon which the Commissioner could base a conclusion that the true intent of AM JB was not to lease the airplane to CWI, despite the use of the term in the one agreement, but to operate a charter service. Such is not a `sale' within the meaning of R.C.5739.01(B)(1) and 5739.01(E)(1). Laurel, supra. While AM JB has argued that it intended to resell the jet in much the same way as the taxpayer in Fliteways, and should be granted the exception despite the airplane's use, we do not find that Fliteways lends support to AM 
JB's position. In Fliteways, the taxpayer used its planes in its charter service while still holding the aircraft out for sale. While the chartering of the planes did not constitute a `sale' under R.C. 5739.01(B), the ongoing intent to ultimately resell the airplanes was established by the evidence. Unlike the situation in Fliteways, the record here does not evidence the intent to resell the plane. The record before describes a charter service, which does not constitute a `sale.'"
 {¶ 14} The material facts were undisputed at the administrative level, and the parties agreed to submit the matter on an agreed transcript containing exhibits. The partnership purchased the aircraft with the intention of leasing it to CWI. The primary users of the aircraft were executives at Invacare Corporation, although Invacare's use of the aircraft would not be full-time and the partnership intended to lease the aircraft to third parties for charter. The aircraft was the corporation's sole asset.
 {¶ 15} The charter lease agreement between the partnership and CWI extended for twelve months, with automatic renewals of six-month terms. Lease fees for the aircraft varied depending upon the user: $1,016.50 for each hour of time chartered by an AM JB shareholder; $1,712 for each hour of time chartered by a member of the general public; and $1,899.28 for each hour of time chartered by Invacare Corporation. AM JB was guaranteed a monthly payment of $14,266.60, regardless of how many hours the aircraft was actually chartered in a month.
 {¶ 16} The partnership and CWI also signed an "aircraft management and operation agreement" which, by its terms, superseded any other agreements. The management agreement provided that all flight operations of the aircraft, including staffing the crew, would be under the exclusive control of CWI. Nevertheless, the partnership retained final approval over the selection of those crew members. Moreover, the management agreement made the partnership responsible for all costs pertaining to the operation of the aircraft, including crew fees, management fees, marketing fees, hangar rental, insurance, crew training, flight crew service, crew lodging, crew per diem, and supplies. While AM JB was responsible for these fees and costs, the agreement provided that the partnership would have all invoices sent to CWI for payment, with credit given to CWI for the costs.
 {¶ 17} We agree with the board's conclusion that no true lease existed between AM JB and CWI. The board agreed with the tax commissioner's conclusion that CWI merely managed the aircraft without retaining any degree of ownership consistent with a lease arrangement. AM JB received money from third-party charter fees.
 {¶ 18} Legal counsel for the department of taxation noted that the current management agreement was changed from a prior management agreement between AM JB and CWI. Under the prior management agreement, AM JB received charter receipts less expenses. The present arrangement changed that requirement to force CWI to pay a monthly lease fee of $14,000. Legal counsel stated:
 {¶ 19} "Essentially, I do not see how the relationship between your client and CWI has fundamentally changed under the new agreements. Your client owns an airplane and CWI contracts to manage and operate that plane. Your client receives revenue from the charter operations of the plane and pays the operating expenses of CWI. CWI does not receive a fixed fee, but retains a portion of the amounts it bills for chartering the plane.
 {¶ 20} "* * *
 {¶ 21} "The Charter Lease Agreement is essentially nothing more than a document allocating revenues between client and CWI. In this sense it is serving the same function as the Charter Marketing Agreement used for the previous plane. While the Charter Lease Agreement does specify a base amount of rent, this amount is paid only if the Use Charge is less than that rent amount. There is no evidence this has ever happened. In every month since the agreement went into effect, your client received an amount equal to the total Use Charge, which was greater than the base rental amount. Functionally, the Use Charge operates in the same manner as the former `payback rate.' In both cases your client receives the charter rate less the amount retained by CWI."
 {¶ 22} Competent, credible evidence supported the board's conclusions in this respect. The allocation of fees did not affect the underlying reality that CWI was performing operational and charter management of the aircraft. As if to underscore this point, the management agreement listed CWI as an "agent" of the partnership. A review of the stipulated facts shows that AM JB retained such degree of control over the aircraft that the true intent of the parties was to operate a charter service. In fact, the partnership retained a degree of control over the aircraft that was inconsistent with a lease arrangement. The partnership was entitled to veto the use of any third-party charter. It was responsible for all maintenance costs associated with the aircraft, and even though it did not perform the actual maintenance on the aircraft, it was responsible for hiring the maintenance crews. It is the rare lease situation where the lessor makes himself responsible to pay the costs that are traditionally borne by the lessee.
 {¶ 23} The board could find the true relationship shown by a provision of the management and operation agreement that named CWI as an "agent" of the partnership. AM JB argues that this language has no independent legal significance, but the board was entitled to find otherwise. Throughout the management agreement are provisions that give AM JB veto authority over items that one would think were key elements of ownership. For example, AM JB had the right to veto any third-party charter.
 {¶ 24} Competent, credible evidence supported the conclusion that CWI was acting as the charter agent for the partnership and not as a true lessee. The attorney general correctly points out that the partnership failed to produce any evidence to the contrary, having waived its right to an evidentiary hearing before the board. Given these circumstances, there is no evidence upon which to find the board acted unreasonably.
 {¶ 25} The parallels between the CWI management agreement in Laurel and in this case are too pronounced to be distinguishable. The assigned error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant his costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Board of Tax Appeals to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, J., CONCURS.
 TERRENCE O'DONNELL, J., DISSENTS WITH SEPARATE DISSENTING OPINION.